# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ALEXANDER MOSKOVITS,

      Plaintiff,

vs.                                    Case No. 2021-_____

FEDERAL REPUBLIC OF BRAZIL,

STATE OF SANTA CATARINA, BRAZIL

CELESC OF SANTA CATARINA, BRAZIL

STATE OF MARANHÃO, BRAZIL

STATE OF MATO GROSSO, BRAZIL

RAIMUNDO COLOMBO,

JORGE SIEGA, and

DOES 1 through 10, inclusive,

      Defendants.

_____/


## VERIFIED COMPLAINT (JURY TRIAL DEMANDED)

Plaintiff, Alexander Moskovits (Plaintiff), hereby files his Verified Complaint against the defendants Federative Republic of Brazil (BRAZIL), State of Santa Catarina, Brazil, CELESC (the state-owned electric utility) of Santa Catarina, Brazil, State of Mato Grosso, Brazil, State of Maranhão, Brazil, and individual defendants Raimundo Colombo, and Jorge Siega.

1

# I. NATURE OF THE ACTION

1. This action involves approximately $2*B*illion in unprecedented transactions closed in New York, NY between Bank of America, N.A., d/b/a Bank of America Merrill Lynch (BOA), and the Brazilian subsovereign States of Santa Catarina, Mato Grosso, and Maranhão, all of which were brokered by Calvin Grigsby (GRIGSBY), as an agent/broker for BOA and other lenders. Plaintiff's unique work product and services as GRIGSBY's authorized representative were misappropriated because ***Plaintiff refused to participate in closing any transactions through foreign corrupt practices.***

2. BOA's transactions with the defendant Brazilian states have been described as ***unprecedented*** by Milbank, Tweed, Hadley & McCloy LLP. What enabled closing these unique transactions was the work product of the Plaintiff who confided to GRIGSBY his forward-thinking[1] "novel idea" (*i.e.,* an additional guarantee of repayment of the credit extended by the lender to the *sub-sovereign* states from the sovereign BRAZIL, facilitated by pledged cash flows allocated from the sovereign to its *sub-sovereign* states, including future[2] royalties), and prospected for clients as GRIGSBY's representative.

---

[1] At the time when Plaintiff confided to GRIGSBY the novel, unprecedented financing structure, which GRIGSBY labeled a "tremendous idea" in his ***March 12, 2011*** email, *see* ¶20, *infra*, the allocation of oil royalties to be distributed by the sovereign BRAZIL to sub-sovereign states and municipalities was still being negotiated.

[2] There were then only projections of future oil royalties as the producing states, such as Rio de Janeiro, were seeking a lion's share of the oil royalties to be allocated, rather than distribution to all sub-sovereigns based strictly on census-driven demographic data.

At least one other $400 Million credit transaction was closed with CELESC, a state-owned utility in Santa Catarina, using Plaintiff's unique work.

## II. AGGRAVATING CIRCUMSTANCES

3. On **_December 27, 2012_**, BOA closed a $726 Million contract with the State of Santa Catarina executed by then Governor Raimundo Colombo (COLOMBO) at BOA's headquarters in Manhattan. On **_March 22, 2013_**, a relative of a Governor COLOMBO's Director of Accounting involved in the $726 Million transaction attempted to murder the Plaintiff, five days after Plaintiff complained to defendant Jorge Siega (SIEGA) that his work product and services had been misappropriated to close the credit transaction because Plaintiff was unwilling to pay kickbacks/bribes to Brazilian public officials.

4. The **_March 22, 2013_** attempted murder was contemporaneously reported to local Brazilian police, an acquaintance of the Plaintiff who is a Supervisory Agent of the Internal Revenue Service (John Pesnichak), and an FBI agent then stationed at the U.S. Embassy in Brazil. On **_March 29, 2013_**, seven days after the attempted murder, Plaintiff was interned in a mental health clinic in Uruguay, where Plaintiff remained under chemical sedation until **_April 5, 2013_**.

5. Plaintiff conducted a three-year investigation that was hindered by the defendants State of Santa Catarina and BRAZIL, but he was still able to establish **_in 2016_** that the attempted murder employed Rafael Souza Pereira,

a convicted murderer with close consanguinity to Adriano Souza Pereira, the Director of Accounting for the State of Santa Catarina, whose name and signature appear on records submitted in support of the $726 Million credit transaction with BOA. *See* Exhibit A (attestation signed by COLOMBO and Adriano Souza Pereira; photos of Rafael and Adriano Souza Pereira). Some of the defendants have also engaged in a long-term course of malicious conduct that has included hacking Plaintiff's emails to attempt to erase and tamper with evidence related to the credit transactions at issue in this action, and slandering/libeling Plaintiff, which has severely hindered Plaintiff's ability to earn more than a subsistence living.

### III. DAMAGES

6. Plaintiff seeks no less than $7 Million in compensatory damages based on the compensation formula promised to Plaintiff by BOA's agent/broker GRIGSBY (35 basis points on transactions of $500 Million or more, and 70 basis points on anticipated transactions under that value). Plaintiff seeks compensation from all of the defendants under a quasi-contract theory (unjust enrichment and *quantum meruit*). Plaintiff is also entitled to punitive damages based on the wanton disregard for his rights aggravated by the criminal conduct that interfered with the Plaintiff's ability to be contracted by GRIGSBY and paid for Plaintiff's unique work product and services by either GRIGSBY or BOA or any of the named defendants.

## IV. JURISDICTION AND VENUE

7. This is a civil action where the Plaintiff seeks, exclusive of interests and costs, no less than $7 Million in compensatory damages in addition to punitive damages from the defendants who were unjustly enriched by using Plaintiff's work product and business introduction services to close the aforementioned transactions in Manhattan at the headquarters of BOA with a value of approximately $2 *B*illion. The federal courts have jurisdiction to decide whether or not the Brazilian sovereign and *sub-sovereign* states are immunized by the Foreign Sovereign Immunities Act, where all of the credit transactions at issue constitute "commercial activity," which had a direct effect within the United States. *See e.g.,* 28 U.S.C. § 1605(a)(2).

8. Venue lies in this Court as the contracts that give rise to this suit were signed in New York City (NYC), the funds credited and repayments were wired from and into accounts in NYC. The contracts between BOA and the three Brazilian *sub-sovereign states*, all guaranteed by BRAZIL, expressly provided that any disputes arising from the financial transactions were to be resolved under New York law. *See e.g.*, Exhibit B ($726 Million agreement executed by BOA, State of Santa Catarina, and BRAZIL) at p.26, ¶13.09 (New York law governs disputes). The defendants maintain contacts and transact business in this venue, including conducting business through bank accounts and offices in New York City.

## V. THE PARTIES

9. ALEXANDER MOSKOVITS is an individual, *sui juris*, and a dual citizen of Brazil and the U.S., residing in the State of Santa Catarina, Brazil.

10. The FEDERATIVE REPUBLIC OF BRASIL (BRAZIL) is a foreign sovereign state as broadly defined under the First Article of its Federal Constitution (1988) ("**1st Art.** The Federative Republic of Brasil, formed by the ***indissoluble*** union of its states and municipalities and of the Federal District, constitutes itself as a democratic State [under rule] of law") (emphasis and brackets added).

11. The STATE OF SANTA CATARINA is a foreign *sub-sovereign* state "inseparable" from BRAZIL as broadly defined under the First Article of its Constitution ("**1st Art.** The State of Santa Catarina, a unit inseparable from the Federative Republic of Brasil, formed by the union of its municipalities, aiming the construction of a free, just and solidary society, shall preserve the guiding principles of a democratic state under rule of law") (a) CELESC is an agency or instrumentality of the State of Santa Catarina.

12. THE STATE OF MATO GROSSO is a foreign *sub-sovereign* state "integrated" to BRAZIL as defined under the First Article of its Constitution ("**1st Art.** The State of Mato Grosso is an integrated member with its municipalities and districts, of the Federative Republic of Brasil").

13. THE STATE OF MARANHÃO is a foreign *sub-sovereign* state "integrated" to BRAZIL as defined under the First Article of its Constitution ("**1st Art**. The State of Maranhão and its municipalities are integrated with political and administrative autonomy to the Federative Republic of Brazil").

14. RAIMUNDO COLOMBO is an individual, *sui juris,* and former Governor of the STATE OF SANTA CATARINA at all relevant times, residing in the State of Santa Catarina, Brazil.

15. JORGE SIEGA is an individual, *sui juris*, residing in the State of Santa Catarina, Brazil.

## VI. FACTUAL BACKGROUND

16. On February 18, 2011, GRIGSBY emailed Plaintiff urging him not to "forget" that GRIGSBY "operate[d] container ports and can deliver container cranes." Plaintiff originally met GRIGSBY when Plaintiff was a member of the defense team that successfully defended GRIGSBY in the late 1990s on federal criminal charges brought against GRIGSBY, alleging that GRIGSBY had stolen public funds from the container Port of Miami and that he had bribed a Miami public official to influence other officials to close bond deals with GRIGSBY, ***who was acquitted of all charges***. Plaintiff replied flagging port opportunities in Brazil due to an "oil boom."

From: Calvin Grigsby (cgrigsby@grigsbyinc.com)
Sent: Fri 2/18/11 12:16 PM [**PST]**
To: alexander moskovits (alexander.moskovits@hotmail.com)

Hey man Don't forget we operate container ports and can deliver container cranes.

From: alexander moskovits (alexander.moskovits@hotmail.com)
Sent: Friday, February 18, 2011 11:06 AM [**Brazilian time zone**]
To: Calvin Grigsby

Imbituba and other ports in Brazil are fair game as the country prepares for **oil boom.** Alex

17. The reference to an "oil boom" sparked GRIGSBY's interest:

From: Calvin Grigsby (cgrigsby@grigsbyinc.com)

Sent: Fri 2/18/11 3:57 PM

To: alexander moskovits (alexander.moskovits@hotmail.com)

You mean offshore drilling or land based drilling?

18. On February 19, 2011, Plaintiff replied to GRIGSBY that the boom involved offshore drilling. GRIGSBY in turn replied with a "wow."

From: alexander moskovits (alexander.moskovits@hotmail.com)
Sent: Sat 2/19/11 3:38 AM
To: Calvin Grigsby (cgrigsby@grigsbyinc.com)

Offshore drilling... 500 miles along Brazil's Atlantic Ocean. Government-owned Petrobras is a world leader in offshore exploration.

From: Calvin Grigsby (cgrigsby@grigsbyinc.com)
Sent: Sat 2/19/11 11:12 AM
To: 'alexander moskovits' (alexander.moskovits@hotmail.com)

wow

19. On Saturday, March 12, 2011, Plaintiff sent GRIGSBY an email confiding a forward-thinking financing model backed by "oil royalties" mandated by Brazilian federal law to "make [ ] a fortune in Brazil."

From: alexander moskovits <alexander.moskovits@hotmail.com>
Date: Sat, 12 Mar 2011 09:02:57 -0500
To: Calvin Grigsby<cgrigsby@grigsbyinc.com>
Subject: PETROLEUM-BACKED BRAZILIAN MUNICIPAL BONDS FOR PORT EXPANSIONS AND OTHER MAJOR MUNICIPAL PROJECTS

Cal*, I would like to discuss the business model that can make us a fortune in Brazil*. We can back municipal bonds with petroleum barrels and even do some lombarding (my father´s specialty using warehoused commodities as collateral for commodity production financing). Although the focus is on petroleum because of mandatory Brazilian law that all municipalities will receive oil royalties in proportion to their population, there are other commodities with predictable valuation over time in Brazil that could support lombard financing which was father´s specialty. I will review MOU and suggest revisions for your consideration. Alex

20. GRIGSBY replied on that same Saturday, qualifying Plaintiff's proposal as a "*tremendous idea*". On Sunday, March 13, 2011, Plaintiff further confided to GRIGSBY the contours of his idea of securing credit for *sub-sovereign* transactions "*guaranteed by the Brazilian government*." Plaintiff began to acquaint GRIGSBY with *sub-sovereign* clients that could benefit from the Plaintiff's novel idea. On that same Sunday, Plaintiff and GRIGSBY began to brainstorm on the legal issues to implement the idea.

From: **Calvin Grigsby** (cgrigsby@grigsbyinc.com)

Sent: Sat 3/12/11 8:24 PM

To:  alexander moskovits (alexander.moskovits@hotmail.com)

Alex **sometimes its amazing how well your mind works that is a _tremendous idea_** as usual implementation is the key but we can securitize the oil revenue as long as Brazilian law has the appropriate provisions can u get me a translation?

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Sun 3/13/11 6:09 PM
To:  Calvin Grigsby (cgrigsby@grigsbyinc.com)

I am glad that you agree with the merits of the concept. For example, the municipality of Garopaba, Santa Catarina, Brazil now needs 25 million Reais ($15 Million) for sewage project, the municipality of Imbituba will need funding for port expansion, etc. Please confirm that legal question to be researched is whether Brazilian law allows securitizing oil revenues.   My question to you is why can't U.S. law be applied and the bonds offered in US market albeit using guaranteed foreign oil royalty revenues earned by municipalities as mandated by Brazilian federal law? Is there no precedent for issuing bonds in U.S. backed by foreign collateral? In this case, the collateral is _**guaranteed by the Brazilian government.**_ Petrobras made corporate history with its recent initial public offering.


From:**Calvin Grigsby** (cgrigsby@grigsbyinc.com)
Sent: Sun 3/13/11 6:47 PM
To:  alexander.moskovits@hotmail.com


The Brazilians law must specifically allow irrevocable pledge. Sent via BlackBerry by AT&T

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Sun 3/13/11 7:12 PM
To:  Calvin Grigsby (cgrigsby@grigsbyinc.com)

I will immediately work on researching the issue of irrevocable pledge under Brazilian law. Alex

21. On March 17, 2011, Plaintiff followed-up with a progress report

to GRIGSBY, informing him that Plaintiff contacted the Department of State

Commercial Specialists stationed at the U.S. Embassy in Brazil, which

GRIGSBY qualified as a "good idea."

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Thu 3/17/11 4:25 PM
To:   Calvin Grigsby (cgrigsby@grigsbyinc.com)


Calvin, I have submitted inquiry regarding irrevocable pledge of government-backed royalties to the Department of State Commercial Specialists stationed at the U.S. Embassy in the capital of Brasilia. I'll keep you posted. If that does not produce the answer to the legal question by the specialist particularizing the governing Brazilian law, I will have to contact a commercial transaction law firm to obtain the answer.

From:**Calvin Grigsby** (cgrigsby@grigsbyinc.com)
Sent: Thu 3/17/11 4:27 PM
To:   alexander moskovits (alexander.moskovits@hotmail.com)

Good idea

Sent via BlackBerry by AT&T

   22. On March 18, 2011, Plaintiff reported to GRIGSBY, informing

that Plaintiff called both the U.S. Embassy and a U.S. Consulate in Brazil

and was informed that "irrevocable pledges are commonplace in Brazilian

business affairs."

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Fri 3/18/11 11:26 AM
To:   Calvin Grigsby (cgrigsby@grigsbyinc.com)

CAL, I CALLED THE EMBASSY AND THE CONSULATE AND THE INITIAL WORD IS THAT IRREVOCABLE PLEDGES ARE COMMONPLACE IN BRAZILIAN BUSINESS AFFAIRS. I HAVE ASKED FOR GOVERNING LAW BUT THAT DID NOT SIT WELL WITH THE SPECIALIST. HE ASKED ME TO FOLLOW-UP FOR LAW. ALEX

23. On April 21, 2011, Plaintiff advised GRIGSBY that he arranged a

meeting with the Director of the Port of Imbituba, Santa Catarina, Brazil.

From: **alexander.moskovits@hotmail.com**
Sent: Thu 4/21/11 1:15 PM
To:   Calvin Grigsby


… I am meeting with Director of Port of Imbituba next week. This is a port
in expansion. Two major manufacturers (cement and automotive) are
building nearby; State of Santa Catarina is expanding width of all access
roads, etc. Brazil´s newfound oil wealth will stimulate seaport activity.
Kindly take a look at photos below and let me know what to offer the port
director. The Dr. is a veteran of the port system in Brazil and can open doors
at ports everywhere according to local politician. Let me know what Grigsby
Inc. can offer Brazilian ports (new, online, and expanding). I need to know
the pitch to have an intelligent conversation.

24. Before his meeting with the Director of the Port of Imbituba, Santa

Catarina, Brazil, Plaintiff obtained GRIGSBY's written confirmation that

Plaintiff could represent GRIGSBY throughout South America.

From: **Calvin Grigsby** (cgrigsby@grigsbyinc.com)
Sent: Tue 4/26/11 5:25 AM
To:   'alexander moskovits' (alexander.moskovits@hotmail.com)

Yes exactly. You are hereby authorized to represent the firm throughout
south America. Calvin

25. On the same date, Plaintiff wrote to GRIGSBY as to Plaintiff's

plan to access port directors throughout the seaport system of Brazil and his

contact with a federal Congressman to obtain forward-looking "projections

on" the anticipated "distribution of  oil royalties by municipality and state."

Plaintiff noted that he helped draft the written inquiry to the Congressman in

Portuguese preserving the confidentiality of his novel financing model, ("I helped draft the written inquiry to the Congressman in Portuguese without providing any of the details of the business model"), referring to "the local intermediary."

From: **alexander.moskovits@hotmail.com**
Sent: Tue 4/26/11 5:17 PM
To: Calvin Grigsby

I will keep the initial meeting informal focusing the discussion on a wish list for port expansion and his access to other port directors throughout the system. Today, inquiry was made with a "Deputado Federal" (equivalent of U.S. Congressman) for this district seeking projections on distribution of oil royalties by municipality and state. This particular Congressman is on the energy panel according to the local intermediary. I helped draft the written inquiry to the Congressman in Portuguese without providing any of the details of the business model. Alex

26. On April 27, 2011, Plaintiff and GRIGSBY exchanged emails about the fundamentals that would allow "creat[ing] a new bond market."

From: Calvin Grigsby (cgrigsby@grigsbyinc.com)
Sent: Wed 4/27/11 11:11 AM
To: 'alexander moskovits' (alexander.moskovits@hotmail.com)

Alex: Investments in Brazilian Government Bonds are closely linked to the Brazilian Real which has been the best performing currency among currencies tracked by Bloomberg over the last few years. The Real is fully convertible in all major financial hubs worldwide and Brazil's Government Bonds are rated by all three rating agencies.

Brazilian Government Bonds Ratings:
Moodys: BAA3
S&P: BBB+
Fitch: BBB-

*By using the public finance approach we will be able to get separate ratings away from the government bonds and actually create a new bond market for local and state infrastructure projects.*

From: **alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Wed 4/27/11 12:25 PM
To:   Calvin Grigsby (cgrigsby@grigsbyinc.com)


The Brazilian Real in 2004 before the discovery of major offshore oil deposits was exchanging at 3 Reais per USD. Today, exchange is getting close to 1.5 Reais per USD. The appreciation of the Real is also linked to higher interest rates that are allowed to be charged in Brazil so dollars are pouring into Brazil further appreciating the value of the Brazilian Real. When the U.S. starts to buy the barrels from Brazil as opposed to less friendly sources, the econometric conclusion is inescapable. Without Central Bank intervention in the currency marketplace to protect the competitiveness of Brazilian export prices from the declining purchasing power of the dollar, the forces of economics promise appreciation of the Brazilian Real in the next 10 years. Inflation has remained stable and at low levels.

   27. On April 27, 2011, Plaintiff reported to GRIGSBY regarding his

meeting at the Port of Imbituba, Santa Catarina, Brazil with the local

businessman and official who arranged it, and requested that GRIGSBY send

him business cards and set up *amoss@grigsbyinc.com*.


From: **alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Wed 4/27/11 12:28 PM [emphasis supplied and added]
To:   Calvin Grigsby (cgrigsby@grigsbyinc.com)


Local businessman and Vereador (equivalent to Municipal Commissioner) arranged today´s meeting with Port Director Gilberto Pereira. I was introduced as the representative of Grigsby Inc. for South America. The existing port administrators have an expiration date coming up. The current Director of the Port has 40 years experience in the Brazilian port system (25 of those years in the Imbituba Port). *In the coming months, Director Pereira is organizing his own private company that would participate in the RFP that is projected for January, 2012 (8 months from*

*now) to take over administration of the port.* There would be *no conflict of interest* as he would exit his long-held position as Port Director in order to establish his company (benefiting from his unparalled know-how). The analogy is a Fiscal Operations with the Port Director going into private enterprise after 25 years of public service as your administrative know-how partner sharing in the revenues to be earned from projected cash flows that are at his fingertips. The local Commissioner is interested because the expanding port will generate employment and increased tax income that would benefit the local communities. *I explained that you also possessed 40 years of experience in financing infrastructure projects of great value and, more specifically, specialized experience with major U.S. port projects. His company is seeking a finance partner to make best possible proposal at the time of the RFP (locally known as "licitacao").* As the Port Director emphasized his know-how in the Brazilian Port System, I also emphasized your superior know-how in seaport infrastructure financing. He added your website to his "favorites" on his desktop as I suggested that he become acquainted with Grigsby Inc. *His group will be the most experienced without parallel, and he is interested in partnering with Grigsby, Inc. to submit a proposal early next year in response to the RFP.* He expects to have his private company organized within two months to facilitate fast-tracking the governmental bureaucracy involved, and would then like to sit down with you to discuss a partnership as soon as he obtains the RFP parameters. His vast experience with the bureaucratic and legal maze will provide him with early access to those parameters. He explained that the fee contracts are *generally* structured as 25-year deals with the right of renewal for another 25 years. **I suggested that the cost of money should be much lower than high Brazilian rates which should allow for charging competitive fees to attract increased container business to the port.** At present, the usage fee model is emerging as the most viable during these informal preliminary discussions. He would like to raise 100 million Rs. (just north of $60 million USD at current exchange rate) for the first phase of the port expansion needed for the projected increasing business to be generated from new major local Imbituba manufacturers (cement, automotive, etc.) and other regional users of port services. Imbituba is fast becoming a major industrial manufacturing hub. For example, we saw major industrial plant construction in progress by one of Brazil´s cement giants. We will have another in-person meeting with the Port Director before the end of May. The Commissioner will remain on

top of the situation. The meeting was positive and exceeded my expectations inasmuch as the Port Director surprised me with his plan to leave the public office he has occupied for a quarter century to establish his own Fiscal Operations *with Grigsby, Inc. as an invited partner given your experience and know-how which I described as "unparalleled." **I need you to send me business cards (contact information to be provided) and establish amoss@grigsbyinc.com** for me as the local Commissioner is arranging more meetings with similarly situated parties in charge of other regional ports. Alex P.S. I am making inquiries to quantify the projected oil royalty distributions to obtain some ballpark figures.*

28. On May 3, 2011, GRIGSBY wrote that Plaintiff's business cards would use GRIGSBY's New York City address and notified Plaintiff that his office manager "Hakim Kriout" was informed that Plaintiff had been authorized to solicit business opportunities in South America.

From: Calvin Grigsby (cgrigsby@grigsbyinc.com)
Sent: Tue 5/03/11 4:30 PM
To: 'alexander moskovits' (alexander.moskovits@hotmail.com)
Cc: 'HAKIM KRIOUT (hkriout@grigsbyinc.com)

Alex send business cards we are going to use the downtown NYC address as your home office on your business cards.? Big conf room and extra office there if you need it.? Hakim Kriout is manager of that office who will refer you calls if need be.? If you get a moment call Hakim he can assist with your South American clients as he is fluent in Spanish and Portuguese.? ?I have informed Hakim that you are authorized to solicit only in South American for so coordinate with him if there is a need for US investments such as Treasury Bonds or US Stocks Mutual funds or variable annuity insurance products? Calvin

29. On June 1, 2011, Plaintiff wrote to GRIGSBY requesting an agreement on compensation and funds to *reimburse* Plaintiff for expenses

"incurred and to be incurred" after meeting with CASAN, the state-owned water/sewage utility in Santa Catarina, presenting a $1*B*illion opportunity.

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Wed 6/01/11 5:57 PM
To:   Calvin Grigsby (cgrigsby@grigsbyinc.com)

Cal, I would like to talk to you to discuss entering into a formal agreement with Grigsby Inc. so that I can work full-time on CASAN opportunity (>$1 billion USD in next 3 years), local seaport opportunities, etc. Given that CASAN has assigned two staff members from its CFO office to work with Grigsby Inc., it is now time to discuss whether you are willing to fund my work down here by reimbursing for transportation and food expenses incurred and to be incurred. I would like to forego my criminal defense research and writing work and instead focus entirely on working for Grigsby Inc. down here in Brazil, but I need you to commit to cover my back with an annual contract to start. My local Brazilian contact wants to see follow through from us now that his contact with CASAN resulted in their readiness to work with us on obtaining > $1 Billion USD for first phase of water and sewer projects. I need to show local contacts that you are ready to work with CASAN now that water company is ready to move forward in order to retain my credibility. Please call me at 011.55.48.9663.1036 to discuss how you would be willing to compensate me so that I can afford to put in the full-time effort that these business opportunities deserve. Alex

30. On June 16, 2011, Plaintiff reported to GRIGSBY on a meeting held with the head of DEINFRA (the State of Santa Catarina's Department of Infrastructure) Engineer Meller, who was the former head of CELESC. Plaintiff reported that Meller had appointed his successor, who was then in charge of the state-owned electric utility. Meller informed that CELESC was seeking up to the equivalent of $3Billion USD over the next five years, and he disclosed to Plaintiff that their cost of capital was 8.6% *per annum*.

From: amoss@grigsbyinc.com
Sent: Thursday, June 16, 2011 12:44 PM
To: cgrigsby@grigsbyinc.com
Cc:jorge@gsurfnet.com;luiznestor@gsurf.com.br;
marcos@metainsight.com.br
Subject: CELESC - STATE ELECTRIC UTILITY - R$1 BILLION/YEAR

Calvin, I met this morning with Engineer Paulo Meller, the current President of DEINFRA, the state government's department in charge of infrastructure projects. Mayor Luiz Nestor accompanied Eng. Meller to today's meeting. Mayor Nestor is the same gentleman who introduced us to CASAN execs. Before assuming his public office, Eng. Meller was the president of CELESC, the state-owned electric utility. He advised me that the company is seeking up to $5 Billion Reais (>U$D 3 billion at current exchange rates) in the next five years, or $1 Billion Reais per annum. A few initial bullet points as to the financial sources used by CELESC follows: 1. According to Eng. Meller, CELESC's current cost of funds is approximately 8.6% per annum provided by BNDES ("Banco Nacional de Desenvolvimento," or National Bank of Development). They are given two years grace period up front, and the credit must be repaid within 12 to 15 years. I assured him that we could be highly competitive. 2. According to their website, www.celesc.com.br, the utility has obtained investment funds from U.S. pension funds, *inter alia*. The reported liquid net profit of CELESC for FY 2010 was $273.5 million Rs. (>U$D 170 million). 3. Given that it is an electric utility, they collect 97% of their receivables from ultimate users. They offer usage fees to guarantee repayment. Through Mayor Nestor, we'll arrange a meeting with the current hand-picked successor of Eng. Meller as president of CELESC. I will keep you posted. Alex cc: Mayor Luiz Nestor, Jorge Siega, Marcos Andre do Rego Silva

31. On June 19, 2011, Plaintiff wrote to GRIGSBY about the need of local Brazilian partners to define the partnership, noting that Plaintiff had obtained "straight to the top access at both major State of Santa Catarina utilities (CASAN - water and sewer; CELESC - electricity) whose capital needs were in the "multi-billion USD/REAL range." Plaintiff requested and

had a phone conversation with GRIGSBY and advised that local counsel was researching the legal question of forming a Brazilian subsidiary for GRIGSBY. On or about that date, GRIGSBY told Plaintiff that he would receive 35 basis points of all closed deals exceeding a threshold value of $500 Million dollars. However, GRIGSBY insisted on proceeding with his oral promise alone.

From:**alexander moskovits** (alexander.moskovits@hotmail.com)
Sent: Sun 6/19/11 7:52 AM
To:  Calvin Grigsby (cgrigsby@grigsbyinc.com)


Cal, We now have straight to the top access at both major state utilities (CASAN - water and sewer; CELESC - electricity) and their capital needs are in the multi-billion USD/REAL range. Partnership needs to be defined now to satisfy local Brazilian partnership. Kindly call my cell at 011.55.48.9663.1036 this work week to discuss. Local counsel researches legal question on subsidiary formation. Alex

    32. On July 7, 2011, Plaintiff invited GRIGSBY to travel to the State of Santa Catarina, Brazil to meet with high-level Brazilian politicians, a local port director, the director of the department of infrastructure, and the "heads of utility companies seeking billions in investments". GRIGSBY promptly accepted the invitation on the following day suggesting dates.

From:**alexander.moskovits@hotmail.com**
Sent: Thu 7/07/11 5:14 PM
To:  Calvin Grigsby (cgrigsby@grigsbyinc.com)
Can you meet with local port director by flying down within the next two weeks? This is the man who is leaving his federal government post after 20 years to start private group to bid for 25-year port administration contract. While you're here, we can arrange for you to meet with heads of utility companies seeking billions in investments, the director of the state's

department of infrastructure, and local high-level politicians if you so desire. Alex

From:**Calvin Grigsby** (cgrigsby@grigsbyinc.com)
Sent: Fri 7/08/11 12:35 PM
To:    alexander moskovits (alexander.moskovits@hotmail.com)
Maybe 14-17 will let uknow
Sent via BlackBerry by AT&T

33. On July 13, 2011, Jude Kearney, Esquire wrote to GRIGSBY regarding his "*Pursuit of a Financing Mandate in Santa Catarina, Brazil*." *See* Exhibit C (letter from Jude Kearney, Esq., Chairman of International Practice at PATTON BOGGS, LLP (Kearney) to GRIGSBY). Kearney and GRIGSBY shared a close long-term association with former U.S. President "Bill" Clinton. GRIGSBY and Clinton were contemporaries of nearly the same age who grew up in Hope, Arkansas when its population was approximately 8,000 inhabitants. Kearney was reportedly one of several Kearney brothers who served Clinton when he was Governor of the State of Arkansas.

34. GRIGSBY contacted Kearney, a trusted Clinton crony, shortly before traveling to Brazil, a country whose political class is infected by endemic corruption, as demonstrated by the fact that most, if not all, of the public officials involved in the credit transactions at issue in this action have since been impeached and/or criminally charged (Former President of Brazil, Dilma Rousseff, who approved these unprecedented *sub-sovereign*

transactions in writing, was impeached from office in April 2016 and criminally charged in November 2018; Finance Minister Guido Mantega, who was involved in all of the finance transactions at issue in this action, has been criminally charged with impeached President Dilma Rousseff in November 2018 under organized crime charges; State of Santa Catarina Governor Raimundo Colombo who signed the $726 Million contract at BOA headquarters in December 2012 has been charged for accepting unlawful donations from Odebrecht, S.A. to fund his political campaigns, State of Mato Grosso Governor Silval Barbosa who signed the $479 million contract at BOA headquarters in September 2012 has been imprisoned under organized crime, bribery and money laundering charges, State of Maranhão Governor Roseana Sarney, daughter of a former President of Brazil, who authorized the $662 Million contract at BOA headquarters in July 2013, has been charged with a fraud scheme valued at over $100 Million dollars in local Brazilian currency). The major credit transactions at issue in this case were tainted by thieves, including GRIGSBY who misappropriated the work product of Plaintiff, while acting as agent/broker for BOA and other investors.

35. Even four executives of Wilmington Trust, the administrative agent involved in the $726 Million contract, were criminally charged by the U.S. Department of Justice in 2015 and convicted in 2018 for bank fraud and

conspiracy related to false and misleading information in public filings. Wilmington Trust was the administrative agent on all of the transactions.

36. Kearney's letter to GRIGSBY touted "expertise in developing and financing power and utility projects" and access to "equity funds established by members of the royal families in Qatar and Abu Dhabi, as well as in other parts of the Middle East… and private equity fund clients in Europe, Eastern Europe, Africa, Asia, the Middle East and of course in the United States." Kearney "expect[ed] interest within this group of companies in investing in these Brazilian projects…." Kearney suggested a personal "tête-à-tête" with Grigsby, wishing GRIGSBY "good luck" in his meetings with CELESC and CASAN. *See* Exhibit C (brackets added).

37. On July 19, 2011, GRIGSBY communicated with Plaintiff to confirm that he would be in Brazil to meet with the various prospects developed by Plaintiff during August 1-3, 2011.

38. On July 22, 2011, in preparation for the scheduled meeting with CELESC, the state-owned electric utility in the State of Santa Catarina, Plaintiff requested the history of GRIGSBY's electric utility transactions, "like the one previously sent with all of the water and sewer deals". GRIGSBY requested that his office staff forward the requested history, which was received by Plaintiff on the same date.

39. On July 26, 2011, Plaintiff confirmed a meeting with CELESC on August 2, 2011 to be attended by Plaintiff, GRIGSBY and SIEGA.

40. On July 27, 2011, Plaintiff advised GRIGSBY that a series of meetings had been confirmed - a dinner meeting with a Congressman, a dinner meeting with a local mayor, a meeting with the director of the Port of Imbituba, and meetings with both utilities CELESC and CASAN. Plaintiff further advised GRIGSBY that he was working on a meeting with the Governor of Santa Catarina. GRIGSBY replied, "Good work!"

From: cgrigsby@grigsbyinc.com
Date: Wed, 27 Jul 2011 09:09:15 -0700
To: alexander.moskovits@hotmail.com
Subject: RE: DINNER WITH "DEPUTADO FEDERAL" (CONGRESSMAN), etc.

Good work!

41. On July 28, 2011, Plaintiff confirmed to GRIGSBY a meeting with the mayor of the fastest growing county in the State of Santa Catarina and advised that a local county commissioner was attempting to arrange meetings with a federal congressman and the State Governor.

From: alexander.moskovits@hotmail.com
Sent: Thursday, July 28, 2011 6:42 AM
To: Calvin Grigsby
Subject: LUNCH/HELICOPTER RIDE WITH MAYOR OF FASTEST GROWING MUNICIPALITY

Calvin, Local Garopaba "Vereador" (County Commissioner) Rogerio Linhares (aka Dedeu) has arranged for Wed. lunch and helicopter ride with Mayor of "Palhoca" which is the fastest growing municipality in the state of

Santa Catarina. It is the county immediately south of the state capital of Florianopolis. There is a chance that we'll be dropped off by helicopter at the airport for your return flight. Commissioner is also attempting to arrange meetings with Deputado Federal (Congressman) Benedetti and State Governor. I will keep you posted. Alex

42. GRIGSBY arrived in the State of Santa Catarina during the night of July 31, 2011 where he was greeted at the Hercilio Luz airport in the state capital by Plaintiff and defendant SIEGA. GRIGSBY was driven to the home of Plaintiff in Garopaba, Santa Catarina where he stayed for the duration of his visit. The meetings scheduled by Plaintiff through local intermediaries were held on August 1-3, 2011 - CELESC and CASAN, a port director, three county mayors, a federal Congressman, the director of DEINFRA (the Department of Infrastructure), *et al*. Most of whom had previously met with Plaintiff.

43. On August 2, 2011, after the meeting at CELESC headquarters, Plaintiff, GRIGSBY and defendant SIEGA had lunch with the mayor and one of the municipal commissioners of Garopaba, Santa Catarina, at which time, the mayor and commissioner suggested that GRIGSBY be entertained at a local house of prostitution operated by an ex-police officer well-known for involvement in prostituting underage girls, referred to as "*the models*." Plaintiff told GRIGSBY that he should not be enticed by the invitation. All present were clearly displeased with Plaintiff's interference.

44. Later in the evening, Plaintiff, GRIGSBY, SIEGA, the same county commissioner who attended the lunch after the CELESC meeting, and a State Assemblyman, met with State of Santa Catarina Governor Raimundo Colombo at a closed airport restaurant. *See* Exhibit D (photo of all attendees at the meeting). GRIGSBY insisted that he and Plaintiff wear white shirts, red and blue ties, the colors of BOA's logo. Later that evening at the home of Plaintiff, GRIGSBY began to suggest to Plaintiff that such major transactions should be closed by any means necessary, even on a "*pay to play*" basis. Later that same night GRIGSBY subjected Plaintiff to degrading treatment by demanding that Plaintiff to watch GRIGSBY have sexual intercourse with a local prostitute at Plaintiff's home, but Plaintiff declined the disgusting invitation, asking GRIGSBY if that was the way Wall Street bankers "bonded" with their business associates and clients.

45. On August 3, 2011, after the last meeting held in the last hours of GRIGSBY's visit, Plaintiff witnessed GRIGSBY make a corrupt offer to the county commissioner who had arranged the meeting with the Governor. Thereafter, Plaintiff decided to cease doing any additional work to further advance the transactions and sought a "finder's fee agreement."

46. On August 4, 2011, upon his return to the United States, GRIGSBY wrote to Plaintiff stating that Plaintiff and his "partners" were "in

this for 35% of the action[,] you are a joint venture not my employee. …we have to eat what we kill….” (brackets added).

From: cgrigsby@grigsbyinc.com
Sent: Thu 8/4/2011 11:44 AM
To: alexander.moskovits@hotmail.com

Alex you and your partners are in this for 35% of the action you are a joint venture not my employee. You have to raise initial operating costs by selling a portion of the 35% you own. I have enough cost to pay and manage my lawyers who must review all the new legal requirements of Brazil and pay internal people to structure the deal That is why I keep trying to tell you to focus on and close a single deal so we can get paid I do not have a company with extra cash now we have to eat what we kill I am not interested in the “local business environment” only closed deals and you have to focus on getting a deal closed so you have money to go after the next deal.

47. Shortly after GRIGSBY’s visit to Brazil on August 1-3, 2011, GRIGSBY wrote to Plaintiff and defendant SIEGA that he had “just got off a conference call with [his] attorneys and potential investors” and “identified up to $400 million US for CELESC [the state-owned electric utility in the State of Santa Catarina] as our first client.” Plaintiff’s novel idea of a sovereign “federal guarantee” was mentioned by GRIGSBY. That third layer of guaranteed repayment from the defendant BRAZIL facilitated waiving a [credit] “rating and audited financials.”

From: "Calvin Grigsby" <cgrigsby@grigsbyinc.com>
Date: Fri, 19 Aug 2011 08:16:48 -0700
To: <amoss@grigsbyinc.com> Cc: <jorge@gsurfnet.com>

*Just got off a conference call with my attorneys and potential investors. We have identified up to $400 million US for Celesc as our first client.* What we need to do now is identify the first projects to be financed for Celesc get a memorandum of understanding drafted that gives us an exclusive for 60-90 days on financing at a not to exceed rate for 10 years together with the revenues pledged and the guarantees to be utilized. *We complete this financing as a private placement with our initial investors without a rating or audited financials while at the same time working with the infrastructure group and governor and senator to get the appropriate laws passed to implement our public financing model allowing pledge of user fees with an audit and rating letter together with State and Federal Guarantees.* As to relationship issues, *inter pares*, we are partners in "sickness and in health" and lets just go forward and make some money.

Thanks Calvin

48. Shortly after GRIGSBY identified up to $400 Million for CELESC as the first client, Plaintiff's email *amoss@grigsbyinc.com* was cut off from communicating with CELESC. Plaintiff then forwarded as many of the emails exchanged between him and GRIGSBY via the domain "*grigsbyinc.com*" as possible to *alexander.moskovits@hotmail.com* upon realizing that the GRIGSBY was clearly acting in bad faith.

49. Subsequently, Plaintiff's hotmail.com and defensewriting.com accounts were "hacked," or otherwise invaded to selectively erase or modify email communications, which may require issuing a *subpoena* to obtain the entire string of emails sent from *cgrigsby@grigsbyinc.com*, *4158606446@mms.att.net*, *etc.*, through which GRIGSBY communicated with Plaintiff and others regarding the [known and unknown] transactions. Plaintiff reported the hacking to American and Brazilian law enforcement.

50. On August 22, 2011, GRIGSBY wrote to Plaintiff attempting to persuade him that Plaintiff should not insist on a "written agreement" ("…[Y]ou are a 'rookie' and don't understand how things work in this business and that we operate with no written agreements on billions of dollars of bonds…."). As averred, GRIGSBY had told Plaintiff that the deals would be undertaken with BOA with whom Plaintiff knew GRIGSBY had a long-term relationship as evidenced by his multi-million transactions with BOA both before (Atlanta Airport financing) and after (City of San Francisco) his August 2011 visit. Plaintiff, an alumnus of the Wharton School of Finance, was well aware that "[t]here are lots of rules limiting agreements with a non profesional[] because of regulatory concerns", which further supported Plaintiff's desire to enter into no more than a "finder's fee agreement" with GRIGSBY. To that end, Plaintiff contacted Robert Heim, Esq, NY counsel previously employed by the SEC. Plaintiff did not want to have any involvement in closing transactions after witnessing GRIGSBY clearly make a corrupt offer, on August 3, 2011, to the Brazilian public official who had arranged the August 2, 2011 airport restaurant meeting with the State of Santa Catarina Governor to facilitate closing major transactions. Thereafter, there was no "trust." Indeed, Plaintiff sought a "finder's fee agreement" in order to avoid the possibility of involvement in GRIGSBY closing deals on a "pay to play" basis.

From: cgrigsby@grigsbyinc.com
Date: Mon 8/22/2011, 2:05 AM
To: alexander.moskovits@hotmail.com

There is not always 1% in a deal—it depends on the competitive situation. Sometimes there is 4% in a deal. Other times there is an equity kicker and a lower fixed fee.    In the US the average deal fee is ½ of 1%.  However, in some cases we have to split the deal with another firm.  Sometimes we have to place a deal with a buyer that limits our fee as a condition to taking the deal.    Also there are a lot of soft dollars in these deals.  This is why I would urge you to work with me to close a single account so you can go through the steps.  U take this to mean I have been trying to get out of paying for services.  ***There are lots of rules limiting agreements with a non professionals because of regulatory concerns.  When I say you are a "rookie" and don't understand how things work in this business and that we operate with no written agreements on billions of dollars of bonds***, its because you are substituting native intelligence regarding a "dog eat dog" perspective which prevails in most business dealings on transactions and persons that are regulated and subject to FINRA Rule 2010 which has been in force for 50 years and everyone in this business follows it.  It reads simply as follows:

2010.

Standards of Commercial Honor and Principles of Trade

A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade. That is the main rule in our business which is why there are not a lot of volumes of rules and regulations.  Every day I follow that rule in my dealings and so do other broker dealers.  ***That is why a culture has developed that is based on trust. The agreement you are trying to write is antithetical to this business.  The transactions are too complex to lend themselves to any relationship other than trust.***  Maybe that is why countries like Brazil who do not have such a tradition cannot raise money as expeditiously as in the US.  ***If you can get a deal closed you will get remunerated in the 35% of what we make range and you will start to develop the trust in me you need to move forward***.  ***Otherwise write up whatever you want*** and I will look at it But in the meantime I can see that you would rather miss the opportunity than not have an agreement that brings this down to a level than makes you feel comfortable.  ***So draft it up***.  But its been three weeks since we had our meetings and it sure doesn't look like you want to make any money. Calvin [emphasis added].

51. Plaintiff wrote to GRIGSBY, on August 22, 2011, insisting on a "finder's fee agreement."  Plaintiff noted that his NYC counsel was ready to forward an agreement for GRIGSBY's signature or the signature of a competitor for the finance business.

**From**: alexander.moskovits@hotmail.com
**Date:** Mon 8/22/2011, 5:17 PM
**To:** cgrigsby@grigsbyinc.com
Cc: <jorge@gsurfnet.com>

I am glad that you have instructed me to have the lawyer draft it up.  If you want to move forward with CELESC or any other business down here, you must execute the finder's fee agreement stipulating the previously offered compensation formula asap. I have been asked to bring another outfit who is willing to execute a finder's fee agreement even before traveling to Florianopolis. This competitor who never laid eyes on me (being introduced by a fellow Wharton alum) is ready to sign the finder's fee agreement using the same compensation formula (35% of 1% of transaction face value for deals over $500 Million) even before getting on a plane!!!  NYC counsel is ready to forward same finder's fee agreement for your signature or the signature of the competitor interested in the same business.  Alex cc: Jorge Siega

52. On August 23, 2011, Plaintiff wrote to GRIGSBY seeking written confirmation of his promise that Plaintiff's unique work product and services would be remunerated using the compensation formula discussed with GRIGSBY (i.e., that Plaintff would received 35 basis points of the value of anticipated transactions exceeding $500 Million dollars and 75 basis points for transactions below that value.  Plaintiff wrote his email to GRIGSBY from the Brazilian time zone and GRIGSBY replied with his confirmation of said compensation formula from the California time zone. Plaintiff then

wrote to his attorney in New York that Plaintiff had obtained confirmation from GRIGSBY of the confirmation formula as experienced counsel had advised Plaintiff.

**From:** alexander.moskovits@hotmail.com
**Date:** Tue, 23 Aug 2011 02:45:36 -0400
**To:** cgrigsby@grigsbyinc.com
**Subject: 35% of 1% of > 500Mil; 35% of 2% of < 500Mil**

Cal, I have to ask you point blank if you are going to sign agreement using this compensation formula, *i.e. 35% of 1% transaction value of > 500Mil deals; 35% of 2% of transaction value < 500Mil deals*. I need a yes or a no so that we can move forward asap. Alex

**From:** cgrigsby@grigsbyinc.com
**Date:** Tue, 23 Aug 2011 15:17:16 +0000
**To:** alexander.moskovits@hotmail.com
**Subject:** 35% of 1% of > 500Mil; 35% of 2% of < 500Mil

**Yes will sign with that provision Sent via BlackBerry by AT&T**

**(Emphasis added).**


**From:** alexander.moskovits@hotmail.com
**Sent:** Tue 8/23/2011 11:26 AM
**To:** rheim@meyersandheim.com
**Subject:** Re: 35% of 1% of > 500Mil; 35% of 2% of < 500Mil

Robert, As per your instructions, I obtained confirmation from Grigsby on the compensation formula. Please see infra. Alex

**From:** cgrigsby@grigsbyinc.com
**Date:** Tue, 23 Aug 2011 15:17:16 +0000
**To:** alexander.moskovits@hotmail.com
**Subject:** 35% of 1% of > 500Mil; 35% of 2% of < 500Mil

**Yes will sign with that provision Sent via BlackBerry by AT&T**

**(Emphasis added).**

53. On August 23, 2011, Plaintiff wrote to GRIGSBY seeking instructions as to when he wanted Plaintiff to deliver the MOU ("Memorandum of Understanding") draft from GRIGSBY's law office regarding the $400 Million transaction with CELESC and memorializing that investors identified by GRIGSBY after his return to the United States were traveling to the offshore oil-producing State of Rio de Janeiro, Brazil.

**From:** alexander.moskovits@hotmail.com
**Sent:** Tuesday, August 23, 2011 5:48 PM
**To:** Calvin Grigsby
**Subject:** $400 Million USD - CELESC MOU DRAFT

I need specific instructions on when you want me to deliver MOU draft from your law firm to CELESC re: $400 Mil USD for projects. Investor guys going to Rio de Janeiro looking for money and that is where all of the oil money is already flowing from tapped platforms. Need MOU and your instructions asap. Alex

54. On August 23, 2011, GRIGSBY replied to Plaintiff requesting an exclusive agreement and that Plaintiff not shop "his" work product on finance structure for electric utility CELESC to Plaintiff's Wharton School alumni network. The normal finance structure for a state-owned utility already required the assignment of usage fees as a guarantee of repayment and the added guarantee of the State of Santa Catarina. Therefore, it was the unique work product of Plaintiff (adding an additonal "triple" layer of repayment guarantee from the defendant federal government of Brazil), *not*

GRIGSBY's "work product," that differentiated the finance structure that

GRIGSBY misappropriated.


**From**: cgrigsby@grigsbyinc.com
**Date**: Tue, 23 Aug 2011 18:00:23 -0700
**To**: alexander.moskovits@hotmail.com
**Subject**: RE: $400 Million USD - CELESC MOU DRAFT

Alex I first need the small stack translated and the agreement. ***If we are***
***going to work by agreement it has to be exclusive on both sides.*** Don't
expect me to send you ***my work product*** on finance structure for CELESC
and have you shop it to your "wharton Alum". (emphasis added).

55. Plaintiff discussed the anticipated $400 Million transaction with

defendant SIEGA on or about August 23, 2011, and, although SIEGA was

well aware of the transaction, he claimed no knowledge of the deal, which

denial led Plaintiff to believe that SIEGA had reached his own deal with

GRIGSBY and was worried that Plaintiff was taping the conversation.


56. On August 23, 2011, Plaintiff wrote to GRIGSBY regarding

GRIGSBY's expressed desire to enter into an "exclusive" agreement "on

both sides" after GRIGSBY agreed on the compensation of 35 points of

anticipated deals exceeding $500 Million and 75 basis points of any

transactions below that value. Plaintiff memorialized that he would not shop

the modified structure for electric or water sewage utility transactions (i.e.

the assignment of utility customer usage fees backed by guarantees of

repayment by the defendant State of Santa Catarina **and the defendant BRAZIL** to create a **"triple" guarantee**). The normal finance structure already required the assignment of usage fees and the guarantee of the defendant State of Santa Catarina, so it was the work product of Plaintiff that differentiated the standard structure which GRIGSBY misappropriated. The email also noted that the investors identified by GRIGSBY for the $400 Million deal with electric utility CELESC would waive audit and credit ratings to close the transaction, which was facilitated by Plaintiff's work product, creating a triple guarantee. The email memorialized that the identified investors were traveling to Rio de Janeiro, Brazil.

**From:** alexander.moskovits@hotmail.com
**Sent:** Tuesday, August 23, 2011 6:16 PM
**To:** Calvin Grigsby
**cc:** jorge@gsurfnet.com
**Subject:** RE: $400 Million USD - CELESC MOU DRAFT

Our NYC law firm will be advised asap that you want exclusive deal with us. Wharton Alumni network produced an interested competitor at request of local Brazilian partners, but I feel comfortable that we can prevail now that you are ready to present MOU for CELESC offering $400 Million USD and Brazilian partners are comforted by Finder's Fee Agreement ensuring compensation formula. I will continue working on translations rather than spin my wheels with Brazilian partners who insisted on agreement. CELESC should be thrilled that process to be simplified by absence of audit and credit rating requirements as per your email. Let's make some money. I'm not going to shop your finance structure to anybody. Cut it out. I am working on CELESC meeting to present your MOU proposal. I've created a sense of urgency because (1) you told me these deals move fast and (2) CELESC investor guys are going this week to oil rich Rio de Janeiro in search of investment money. I don't want to snooze and lose if in fact your investors

are ready to dole $400 Million USD ($650+ Mil Brazil Rs.) waiving audit and credit rating.  Alex  cc: Jorge Siega

57. On August 23, 2011, GRIGSBY in turn replied to Plaintiff instructing him to "***not contact Brazilian electric utility CELESC***" with regard to the $400 Million "MOU" ("Memorandum of Understanding") as GRIGSBY "***ha[d] arranged through [his] law firm communication with them in Portuguese***." GRIGSBY started to ***minimize*** the work product confided and services performed by Plaintiff as his representative, writing that "***setting up meetings is not the major activity***."  Plaintiff became aware that GRIGSBY cut off all communications between CELESC and Plaintiff's assigned email amoss@grigsbyinc.com.  Plaintiff was not doing any further work after witnessing GRIGSBY make a corrupt offer to the Brazilian public official who had arranged the August 2, 2011 meeting with State of Santa Catarina Governor Raimundo COLOMBO.


**From**: cgrigsby@grigsbyinc.com
**Date**: Tue, 23 Aug 2011 18:40:10 -0700
**To**: alexander.moskovits@hotmail.com
**cc**: jorge@gsurfnet.com
**Subject**: RE: $400 Million USD - CELESC MOU DRAFT


Ok.  Lets get working partnership arrangements behind us.  ***But lets not contact CELESC*** until I have completed my preliminary analysis based on the information they have already given us.  ***Just remember in this business no one turns down money at the best terms and rate so setting up meetings is not the major activity***.  It will take several weeks to iron out the terms of the MOU and it will require additional questions to CELESC via email.  ***I have arranged through my law firm communication with them in***

_**Portuguese**_.  Once we have a term sheet and MOU done you will not have a problem getting them to meet.

58. On August 24, 2011, GRIGSBY wrote criticizing Plaintiff for "work[ing] on getting paid" rather than "work[ing] to advance deals."

From: cgrigsby@grigsbyinc.com
Date: Wed, 24 Aug 2011 9:50 AM
To: alexander.moskovits@hotmail.com; 4158606446@mms.att.net

So far You have worked on getting paid but have done no work to advance deals. When do you Start being a banker? Sent via BlackBerry by AT&T

59. On August 24, 2011, GRIGSBY also advised that he was working on a deal with CASAN, the state-owned water and sewage utility that Plaintiff had identified as a business opportunity. Further, GRIGSBY qualified Plaintiff as a "general not a trouper" [sic], recognizing that Plaintiff was not allowing GRIGSBY to minimize the work product that had been confided to GRIGSBY and the prospecting services performed.

From: cgrigsby@grigsbyinc.com
To: alexander.moskovits@hotmail.com
Date: Wed 8/24/2011, 2:21 PM
Subject: Re: Work

I am also working on parallel track on CASAN you are a general not a trouper. Sent via BlackBerry by AT&T

60. On August 24, 2011, Plaintiff wrote to GRIGSBY confirming that the issue of an "agreement and compensation formula" was settled and "strongly disagree[ing] that Plaintiff had done "no work to advance deals".

Plaintiff had identified the electric utility CELESC, and it was Plaintiff's proposed financing structure adding an additional layer of repayment guarantee from defendant BRAZIL that had differentiated the structure. GRIGSBY wrote an email praising Plaintiff for "***doing a good job on the people side***" but claiming that his team needed Plaintiff's "***big brain... to get down to finance work.***" GRIGSBY criticized Plaintiff for refusing to translate documents related to CELESC and for Plaintiff sharing with CELESC that GRIGSBY had identified CELESC as the "first client" in a $400 Million transaction. Plaintiff became aware that GRIGSBY cut off all communications between CELESC and Plaintiff's assigned email *amoss@grigsbyinc.com* as representative of GRIGSBY, who apparently believed that Plaintiff's purported "big brain" could be easily deceived to keep Plaintiff deluged with work as a translator.

**From:** alexander moskovits [mailto:alexander.moskovits@hotmail.com]
**Sent:** Wednesday, August 24, 2011 16:36:38 +0000
**To:** Calvin Grigsby
**Subject:** Work

*Now that we have settled issue of agreement and compensation formula, we're all on same page. I strongly disagree that I have done "no work to advance deals" as my emails and contacts with CELESC, et al. prove.* I have recently traveled to gather more data for potential $400 million sewer project. I am meeting with mayor of another major county to discuss his triple barrel sewer project. I have stayed on top of CELESC people, etc

**From:** cgrigsby@grigsbyinc.com
**Date:** Wed, 24 Aug 2011 10:59:38 -0700

**To:** alexander.moskovits@hotmail.com
**Subject:** RE: Work

Alex  The fact that I mentioned my meeting with potential investors did not mean I asked you to go off and share that with CELESC If we had not wasted a month on getting the short stack translated and your concerns about getting paid we would already have a proposal in front of them.  ***You do a good job on the people side but we need that big brain of yours to get down to finance work***.  ***The only thing that is impressive is when you close a deal.***  An empty wagon rattles.

62. On August 24, 2011, Plaintiff wrote to GRIGSBY seeking a signed contract "asap" and noted that Plaintiff had worked "free of charge" prior to signing a contract as a "courtesy from an old friend." Plaintiff was referring to the prior work done for GRIGSBY as a member of his criminal defense team in 1998 and other work done for GRIGSBY in a civil lawsuit brought by his representative in Miami, one Howard Gary, who was the government's "star witness" in the public official bribery case prosecuted by the federal government against GRIGSBY, which resulted in acquittal.

**From:** alexander.moskovits@hotmail.com
**Sent:** Wednesday, August 24, 2011 11:31 AM
**To:** cgrigsby@grigsbyinc.com
**Subject:** RE: Work

Let's get contract signed asap.  Brazilian partners are talking to NYC counsel tomorrow afternoon.  Consider the free of charge work already in progress prior to you signing contract a courtesy from an old friend.  Try to make it a pleasure to work with you and please stop busting balls unnecessarily.  Alex
P.S. You left your beautiful tie down here.

62. Still on the same date, GRIGSBY complained to Plaintiff that his team was "working on nothing ... neither Electric or wastewater thanks to"

Plaintiff who ceased working after witnessing GRIGSBY make a corrupt offer, on August 3, 2011, to the Brazilian public official who arranged the August 2, 2011 meeting with State of Santa Catarina Governor.

From: cgrigsby@grigsbyinc.com
Date: Wed, 24 Aug 2011 18:20:36 +0000
To: alexander.moskovits@hotmail.com
Subject: Re: Work

I left the CASAN responses to due diligence questions which I was hoping to review to better understand general business and I left the *balancete e demonstrativos contabeis* [balance sheet and other accounting records] to get my finance people started on ways to reformat Brazilian financial statements we are working on nothing right now neither Electric or wastewater thanks to you Sent via BlackBerry by AT&T (brackets added to translate Portuguese in original).

63. On August 26, 2011, GRIGSBY wrote to Plaintiff asking why Plaintiff had stopped working since his departure from Brazil. Plaintiff had stopped working since GRIGSBY's departure because he had witnessed GRIGSBY make a corrupt offer on August 3, 2011.

**From**: cgrigsby@grigsbyinc.com
**Date**: Fri, 26 Aug 2011 14:32:30-0700
**To**: alexander.moskovits@hotmail.com
**Subject**: RE: Work

Well did you go with the Wharton Alums? Is it that you are not working on our deal and have not been working on our deal from the time I left?

64. On August 27, 2011, Plaintiff replied that his records showed the work he had done prior to signing the "finder's fee agreement" that was to be drafted by New York counsel.

From: alexander.moskovits@hotmail.com
Sent: Saturday, August 27, 2011 11:19 AM
To: Calvin Grigsby
Subject: RE: Work

Brazilian partners talked to NYC lawyer who is producing finder's fee agreement. My records show how much work I have been doing free of charge and before agreement signed.

65. On August 28, 2011, GRIGSBY attempted to reconstruct the

record, claiming that "this was supposed to be a joint venture not a finder's

fee agreement with your compensation coming from hours." GRIGSBY

further wrote that a "handshake will be the only agreement. You will see."

Plaintiff did not want a "handshake agreement" after witnessing GRIGSBY

making a corrupt offer on August 3, 2011. GRIGSBY's *non sequiturs* made

it clear that he was acting in bad faith.


**From**: cgrigsby@grigsbyinc.com
**Date**: Sun, 28 Aug 2011 21:55:07 -0700
**To**: alexander.moskovits@hotmail.com
**Subject**: RE: Work

Alex: ***this was supposed to be a joint venture not a finders fee agreement with your compensation coming from hours.*** A bond financing is an all or nothing proposition. Everyone works free of charge until a deal closes. No one gets any credit for anything unless the deal closes. Everyone works to close the deal-- ***the identification of a client does not get anyone paid*** -- working on the deal does not get anyone paid. No closing no money. No money no closing. Its been over a month and there is no joint venture agreement. We haven't even started working on a deal yet. **Everything has to be based on trust. A handshake will be the only agreement. You will see.**

66. On August 29, 2011, Plaintiff advised GRIGSBY that the

agreement being drafted by New York counsel, who was former SEC

counsel, would soon be forwarded to GRIGSBY. Plaintiff also reminded

GRIGSBY that the Brazilian partners were not licensed brokers/dealers.

GRIGSBY replied on the same date that his finance team was "on hold."


**From:** alexander moskovits [mailto:alexander.moskovits@hotmail.com]
**Sent:** Monday, August 29, 2011 11:32 AM
**To:** Calvin Grigsby
**Subject:** RE: Work

You will soon receive agreement drafted by NYC counsel who is former SEC counsel. Agreement comports with securities law and terms are entirely consistent with all of our prior communications. As you are aware, none of the Brazilian partners are licensed broker/dealers.

**From**: cgrigsby@grigsbyinc.com
**Date**: Mon, 29 Aug 2011 12:00:26 -0700
**To**: alexander.moskovits@hotmail.com
**Subject**: RE: Work

Ok My finance team is on hold. We shall see. Calvin

67. On September 7, 2011, Plaintiff sent and GRIGSBY confirmed his

receipt of the "finder's fee agreement" drafted by Plaintiff's counsel.

GRIGSBY claimed he sent the finder's fee agreement for the review of his

attorneys. Plaintiff dangled previously discussed business opportunities in

Uruguay *only* to motivate GRIGSBY to sign the finder's fee agreement

limited to Brazilian business, as Plaintiff had no intention whatsoever to do

any further work for GRIGSBY after witnessing him make a corrupt offer to

a Brazilian public official on August 3, 2011.


**From:** alexander.moskovits@hotmail.com
**Sent:** Wednesday, September 07, 2011 7:11 AM

**To:** Calvin Grigsby
**Cc:** jorge@gsurfnet.com
**Subject:** FINDER'S FEE AGREEMENT

Calvin, Kindly review the attached draft of the finder's fee agreement prepared by former SEC counsel Robert Heim, Esq. of NYC at your earliest convenience. If you are ready to sign, you will be asked to execute the agreement at the Brazilian consulate near your office presenting identification for signature verification. President of Uruguay and Minister of Industry, Energy, and Mining are both ready to meet with you whenever you are ready. Also, because I do not like to deposit "all of my eggs in one basket," as our friend Albert J. Krieger is fond of saying, I have developed even stronger alternative contacts with politicians in Santa Catarina through high net-worth individuals in Florianopolis in case the Garopaba politicians try to "block" for any reason. Keep in mind that Florianopolis is the state capital, and Garopaba is just a small city of 20,000 people. Alex
cc: Jorge Siega

**From**: cgrigsby@grigsbyinc.com
**Date**: Wed, 7 Sep 2011 07:57:42 -0700
**To**: alexander.moskovits@hotmail.com
**Subject**: RE: FINDER'S FEE AGREEMENT

Ok just sent to my attorneys for review

68. On September 9, 2011, Plaintiff sent GRIGSBY the final draft of

the finder's fee agreement drafted by Plaintiff's New York counsel.

GRIGSBY replied that once lawyers get involved "things slow down."

**From:** alexander.moskovits@hotmail.com
**Date:** Fri, 9 Sep 2011 13:45:21 -0400
**To:** cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**cc:** jorge@gsurfnet.com
**Subject:** FINAL REVISED DRAFT OF AGREEMENT

Calvin, As per email just received from Robert Heim, Esq., kindly find attached final draft of the agreement with some revisions (e.g., adding non-circumvention clause). Let me know when you plan to execute the agreement at the Brazilian consulate. Thanks, Alex cc: Jorge Siega

**From:** cgrigsby@grigsbyinc.com
**Date:** Fri, 9 Sep 2011 21:09:42 +0000
**To:** alexander.moskovits@hotmail.com
**Subject:** Re: FINAL REVISED DRAFT OF AGREEMENT

Once the lawyers get involved things slow down
Sent via BlackBerry by AT&T

69. On September 13, 2001, noticing that GRIGSBY was stalling and acting in bad faith as GRIGSBY is a lawyer with extensive experience, Plaintiff sought to obtain the promised finder's fee agreement by writing to GRIGSBY that Plaintiff could work with other finance professionals from his Wharton School of Finance network, as GRIGSBY knew that Plaintiff was an *alumnus* of the Wharton School. GRISGBY replied to Plaintiff on the same date ***adding a thinly-veiled anti-semitic insult to financial injury, causing Plaintiff great emotional distress.***

**From:** alexander.moskovits@hotmail.com
**Date:** Tue, 13 Sep 2011 05:37:36 -0400
**To:** cgrigsby@grigsbyinc.com>; 4158606446@mms.att.net
**Cc:** <jorge@gsurfnet.com>

**Subject:** FINAL REVISED DRAFT OF AGREEMENT

Calvin, You are a lawyer more than capable of reviewing a simple agreement. I reviewed this agreement in less than 15 minutes. Unless we execute an agreement by the end of this month of 9/11, I will move forward with arranging introductions with higher-ups at CELESC et al. for other finance people from Wharton network to pitch their products and services. I have almost completed the CASAN work to be delivered upon execution of the agreement. Alex cc: Jorge Siega

**From**: cgrigsby@grigsbyinc.com
**Date**: Tue, 13 Sep 2011 12:27:57 +0000
**To**: alexander.moskovits@hotmail.com

Please don't hesitate to explore your other options. I would rather u be sure you don't keep holding this over me. This business is based on loyalty and trust. Its so hard to close a deal u can't be looking over your shoulder worried about a wishy washy partner. If your relationships need to see who else is out there please get this out of the way. **Who knows you may find a nice jewish firm more to your liking**. Sent via BlackBerry by AT&T

70. Emails from late September 2011 were exchanged between Plaintiff and GRIGSBY and between Plaintiff and his New York counsel regarding specific language to be included in the "finder's fee agreement."

**From:** alexander.moskovits@hotmail.com
**Date:** Wed, 28 Sep 2011 11:35:27 -0400
**To:** cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**Subject:** REMINDER: NET COMPENSATORY DEFINITION

Im resending email of yesterday replying to CG email of Monday as reminder that we need clear definition of net compensatory specifying costs/expenses to be taken off gross revs. [Cal, Thanks for the prompt reply. I agree with counsel that, at a minimum, to give meaning to the *greater of* language, *net compensatory* language must be defined to the local partners *by identifying specific limited line item costs/expenses* to be deducted from gross compensation to arrive at the net to Grigsby and affiliates.  Lets sign the contract and forge ahead full force. Alex]

**From**: alexander.moskovits@hotmail.com
**Sent**: Wednesday, September 28, 2011 7:40 PM
**To**: rheim@meyersandheim.com
**Subject**: GRIGSBY NET COMPENSATORY DEFINITION

Robert, Grigsby has provided net compensatory data below.  Do you have any thoughts on language for a clause accordingly defining net compensatory so that we can finalize the draft? Alex cc Jorge Siega

**From**: cgrigsby@grigsbyinc.com
**Date**: Wed, 28 Sep 2011 16:08:36 +0000
**To**: alexander.moskovits@hotmail.com
**Subject**: Re: REMINDER: NET COMPENSATORY DEFINITION

Net of professional fees including legal, accounting, programming, marketing, regulatory, engineering etc. Sent via BlackBerry by AT&T

**From**: RHeim@meyersandheim.com
**Date**: Thu, 29 Sep 2011 12:51:33 -0400
**To**: alexander.moskovits@hotmail.com
**cc**: jorge@gsurfnet.com
**Subject**: re: GRIGSBY NET COMPENSATORY DEFINITION

My thoughts are:

If you are agreeable to their proposal then:

1. The fees deducted should be fees actually paid by Grigsby to third parties (i.e. not internal costs)

2. I don't know what Grigsby means to cover with programming, marketing and regulatory fees. Programming and marketing seem like internal fees. I am not sure what regulatory fees Grigsby has in mind but since they are already a broker-dealer these seem like costs that have already been incurred.

Accordingly my sample proposed clause is:

"For purposes of this Agreement the term Net Compensatory Revenues shall mean the gross revenues received by the Company or its affiliates, subsidiaries, officers, shareholders or agents minus deductions for payments made by the Company or its affiliates, subsidiaries, officers or shareholders to third parties for professional fees directly related to the revenue generating transaction including legal, accounting and engineering fees."

Optional additional language: "The total deduction of all such third party professional fees shall not exceed __% of the total revenue received by the Company for any revenue generating transaction."

Please let me know your thoughts.

Robert Heim
Meyers & Heim LLP
444 Madison Avenue, 30th Floor
New York, New York 10022
Phone: (212) 355-7188
Fax: (212) 355-7190
www.MeyersAndHeim.com

71. On October 3, 2011, GRIGSBY stated that his counsel would conduct final review of the finder's fee agreement drafted by Plaintiff'a New York counsel. The emails between Plaintiff and his counsel, and between Plaintiff and GRIGSBY showed discussion of specific language in the agreement drafted by counsel for Plaintiff. The "1.5%" set forth by GRIGSBY was adopted and used in the $726 Million credit agreement signed between BOA and State of Santa Catarina on December 27, 2012 with BRAZIL's guarantee, *see* Exhibit B, Schedule C, in conformity with the novel guarantee structure that was first proposed by Plaintiff to GRIGSBY. It should be noted that Plaintiff and GRIGSBY usually communicating from different time zones (Brazil and California, respectively).

**From:** alexander moskovits [mailto:alexander.moskovits@hotmail.com]
**Sent:** Monday, October 03, 2011 8:08 AM
**To:** rheim@meyersandheim.com
**Cc:** jorge@gsurfnet.com
**Subject:** FINAL NET COMPENSATORY DEFINITION

Robert,

Given that Grigsby inserted 1.5% limit, I have no problem with adding fees that he wants listed (programming, marketing, translation, etc.) although some seem more like internal costs. However, I am left wondering if in setting the 1.5% limit, Grigsby mistook 1.5% of total revenues vs. 1.5% of transaction face value. To illustrate my concern, 1.5% of total revenues anticipates no more than $15,000 (fifteen thousand dollars) to cover various professional fees for each million dollars in total revenues to Grigsby and affiliates. Kindly share your thoughts as to this final concern when reviewing the clause that now reads as follows after addressing Grigsby notes... For purposes of this Agreement the term Net Compensatory Revenues shall mean the gross revenues received by the Company or its affiliates,

subsidiaries, officers, shareholders or agents minus deductions for payments made by the Company or its affiliates, subsidiaries, officers or shareholders to third parties for professional fees directly related to the revenue-generating transaction including any legal, accounting, programming, marketing, regulatory, translation, and engineering fees. The total deduction of all such third party professional fees shall not exceed 1.5% of the total revenues received by the Company for any revenue-generating transaction. I look forward to your reply, Alex

**From**: RHeim@MeyersAndHeim.com
**Date**: Mon, 3 Oct 2011
**To**: alexander.moskovits@hotmail.com
**cc**: jorge@gsurfnet.com
**Subject**: RE: FINAL NET COMPENSATORY DEFINITION

Alex:

I believe your latest draft of the clause is a good one. I can see your point regarding whether Grigsby understands the 1.5% is based on revenue to the Company but that concept is clearly set out in the proposed language. I suppose you could also point the issue out to Grigsby if you were so inclined and then the clause could say:

"The total deduction of all such third party professional fees shall not exceed 1.5% of the transaction amount."

Robert Heim
Meyers & Heim LLP
444 Madison Avenue, 30th Floor
New York, New York 10022
Phone: (212) 355-7188
Fax: (212) 355-7190
www.MeyersAndHeim.com

**From:** alexander.moskovits@hotmail.com
**Sent:** Monday, October 03, 2011 12:37 PM
**To:** Calvin Grigsby; 4158606446@mms.att.net
**Cc:** jorge@gsurfnet.com
**Subject:** Did Calvin set low 1.5% limit by mistake?

Cal, The 1.5% limit you specified in 9/30 email would only set aside $15,000 (fifteen thousand dollars) for third party professional fees to be deducted from each million dollars of gross revenues earned by Grigsby and affiliates.

In fairness to you, Jorge and I are wondering if you specified limit of 1.5% of *company revenues* from each transaction in error. Do you wish to revise limit? Alex cc Jorge Siega

**From**: alexander moskovits
**Sent**: Monday, October 03, 2011 4:21 PM
**To**: Calvin Grigsby; 4158606446@mms.att.net
**cc**: jorge@gsurfnet.com
**Subject**: FINAL NET COMPENSATORY DEFINITION

Cal,

To clarify, you were asked to fill in the blank of sentence drafted by attorney Robert Heim ("The total deduction of all such third party professional fees shall not exceed [blank %] of the total revenues received by the Company for any revenue-generating transaction"). You specified 1.5% to be inserted. We realized that was in error and asked Mr. Heim to redraft sentence accordingly. We will send final draft of the agreement for your signature at the Brazilian Consulate upon your approval of the following language... "For purposes of this Agreement the term Net Compensatory Revenues shall mean the gross revenues received by the Company or its affiliates, subsidiaries, officers, shareholders or agents minus deductions for payments made by the Company or its affiliates, subsidiaries, officers or shareholders to third parties for professional fees directly related to the revenue-generating transaction including any legal, accounting, programming, marketing, regulatory, translation, and engineering fees. The total deduction of all such third party professional fees shall not exceed 1.5% of the transaction amount."

**From**: cgrigsby@grigsbyinc.com
**Date**: Mon, 3 Oct 2011 13:25:58 -0700
**To**: alexander.moskovits@hotmail.com; 4158606446@mms.att.net
**cc**: jorge@gsurfnet.com
**Subject**: RE: FINAL NET COMPENSATORY DEFINITION

My comment was general not in response to the specific language. What I was saying is I rejected the language which limited expenses but would agree to expenses of 1.5% in the aggregate. I apologize that I was not clear and that you misinterpreted my response as filling in a blank. calvin

**From**: cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**Date**: Mon 10/3/2011 3:44 PM
**To**: alexander.moskovits@hotmail.com
**cc**: jorge@gsurfnet.com

This was my message: Where did you get that I specified 1.5% of company revenues?? 1.5% applies to amount raised. Can't just limit to legal accounting. All of the professional fees listed plus translation need to be included but put in a 1.5% limit.

**From**: cgrigsby@grigsbyinc.com
**To**: rchitmon@grigsbyinc.com; alexander.moskovits@hotmail.com
**Date**: Mon, 3 Oct 2011 23:34:57 +0000
**Subject**: Re: FINAL VERSION OF AGREEMENT - READY TO SIGN

I have not submitted this yet to counsel for final review. My attorney was waiting to see if the parties had an understanding. I don't expect his comments until first of next week.

72. On October 4, 2011, Plaintiff noted he was not a *translator*.

Plaintiff also wrote to GRIGSBY seeking a signed finder's fee agreement and asking that Plaintiff's counsel contact GRIGSBY's lawyer. GRIGSBY did not want Plaintiff's counsel to contact his lawyer ("***No do not have your lawyer contact my lawyer. We will get back to u next week***.").

**From:** alexander.moskovits@hotmail.com
**Sent:** Tuesday, October 04, 2011 4:03 AM
**To:** Calvin Grigsby; 4158606446@mms.att.net
**Subject:** TRANSLATION

I am doing limited translation this time as a courtesy. ***I have agreed to act as a finder not as translator/interpreter***. I have to make a living and Grigsby is not paying me a salary.

**From:** alexander.moskovits@hotmail.com
**Date:** Tue, 4 Oct 2011 05:16:47 -0400
**To:** cgrigsby@grigsbyinc.com;4158606446@mms.att.net
**Cc:** <jorge@gsurfnet.com>

**Subject:** FINAL VERSION - LAWYERS CONFERENCE

Doc is still red/blue lined as per Ranola. ***Do you want our lawyer Robert Heim to conference with your lawyer Jude Kearney to expedite process? Robert was open to the idea of contacting Jude regarding our contract.*** We will wait to hear back asap. Alex cc Jorge Siega

**From:** alexander.moskovits@hotmail.com
**Date:** Tue, 4 Oct 2011
**To:** cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**Subject:** PATTON BOGGS

Cal, Given the delay in signing contract, local associates are asking that we have Robert Heim contact CG lawyer (J. Kearney at Patton Boggs) directly to obtain copies of any and all letters sent to referral(s) on behalf of Grigsby. I have asked for patience til next week. This additional delay in signing is being perceived as a stall. It is embarrassing and angering the locals who worked hard to open the right doors. I identified targets for Grigsby, and they delivered the right people on time. Now, we all want an effective agreement in place. Alex

**From:** cgrigsby@grigsbyinc.com
**Date:** Tue, 4 Oct 2011 10:35:37 +0000
**To:** alexander.moskovits@hotmail.com

***No do not have your lawyer contact my lawyer.*** We will get back to u next week. Also u still owe me translations of the small stack of docs as agreed. Sent via BlackBerry by AT&T

    73. On October 4, 2011, GRIGSBY continued to claim that "no communications were sent" to electric utility CELESC, despite his email of August 2011 stating that electric utility CELESC would be the first client for a $400 Million finance transaction and further wrote that ***"[i]f [yo]u [Plaintiff] are acting as a finder then just stay in your lane please."***

**From:** cgrigsby@grigsbyinc.com
**Date:** Tue, 4 Oct 2011 12:51:10 +0000
**To:** alexander.moskovits@hotmail.com; 4158606446@mms.att.net
**Subject:** Re: PATTON BOGGS

I already told u no communications were sent. Please relax. If u are acting as a finder then just stay in your lane please Sent via BlackBerry by AT&T

    74. On October 9, 2011, referring to the finder's agreement being requested by Plaintiff, GRIGSBY again attempted to falsely reconstruct the

clear record of communications by writing that  "I [GRIGSBY] was not looking for partners who open doors.  When this started the idea is that we would be a financing venture not you [Plaintiff] open[ing] doors and GRIGSBY do[ing] all the deal execution." However, the communications evidence that Plaintiff confidentially imparted a novel idea for closing deals with *sub-sovereign* Brazilian entities.  Plaintiff was made GRIGSBY's representative to find clients interested in Plaintiff's work product. GRIGSBY used the forward-thinking guarantee structure proposed by Plaintiff to close credit transactions assigning revenues/proceeds shared by defendant BRAZIL, including but not limited to future oil royalties, with *sub-sovereign* entities, such as defendant States of Santa Catarina, Mato Grosso, and Maranhão, (i.e., Plaintiff's work product).

**From:** Calvin Grigsby cgrigsby@grigsbyinc.com
**DATE**: Sun 10/9/2011, 1:19 PM
**To:** alexander.moskovits@hotmail.com

You put in all that time on the finders agreement and no time on a translation required for closing a deal.  No revenue is being created by the finders agreement.  The revenue comes from the deal.  I was not looking for partners who open doors.  When this started the idea is that we would be a financing venture not you open doors and Grigsby do all the deal execution.

75. Upon information and belief, GRIGSBY made Plaintiff's counsel and Plaintiff go through the process of drafting and revising the attached finder's fee agreement, *see* Exhibit E, which he then signed with SIEGA and/or a company controlled by SIEGA, who actively participated in the

revision process. SIEGA and his associate Jorge Wait had also offered to pitch Plaintiff's idea to other State Governors, including but not limited to the Governors of Mato Grosso and Maranhão.

76. On November 17, 2011, Plaintiff sent emails to GRIGSBY requesting a status report summarizing GRIGSBY's communications with electric utility CELESC, which GRIGSBY described as the first client for a financing transaction of $400 Million, while continuously complaining that GRIGSBY reneged on signing an agreement with Plaintiff and noting his anti-semitic discrimination actionable under the Civil Rights Act.

**From:** alexander.moskovits@hotmail.com
**Date:** Thu, 17 Nov 2011 15:52:29 -0500
**To:** cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**Cc:** <jorge@gsurfnet.com>

**Subject:** STATUS REPORT; CIVIL RIGHTS ACT SECTION 1981 LAWSUIT

Calvin,

***Please provide status report on your efforts with CELESC, etc.*** If I do not hear from you by tomorrow, I will turn the matter over to Miami counsel prepared to take action against you and your company under *Civil Rights Act, section 1981.* ***Your statement referring me to "a nice Jewish firm" has a lot of "nice Jewish lawyers" interested in suing. As a member of a minority that has also suffered discrimination and persecution, you should know better than to make such a harmful and painful statement in writing.*** Alex  cc: Jorge Siega

**From:** alexander.moskovits@hotmail.com
**Date:** Thu, 17 Nov 2011 16:54:41 -0500
**To:** cgrigsby@grigsbyinc.com; 4158606446@mms.att.net
**cc:** jorge@gsurfnet.com

**Subject:** STATUS REPORT; CIVIL RIGHTS ACT SECTION 1981 LAWSUIT

Translation was promised for CASAN materials contingent on your execution of ***an agreement that you promised but failed to sign***. ***Nobody works for free and without a contract***. My lawyer will be filing Civil Rights Act, sec. 1981 lawsuit in the near future if I do not receive status report by tomorrow summing your communications with CELESC etc. Legal research shows that sec. 1981 covers contracts between private parties. ***You continue to underestimate and insult others at your own legal risk.*** Alex cc: Jorge Siega

77. On November 17, 2018, GRIGSBY continued to denigrate Plaintiff ("***as far as I'm concerned you are not a man of your word***") for refusing to translate documents while stating that "***[u]nlike you I do not work on written agreements. With me everything is based on trust.***"

**From**: cgrigsby@grigsbyinc.com
**Date**: Thu, 17 Nov 2011 21:04:45 +0000
**To**: alexander.moskovits@hotmail.com
**Subject**: Re: STATUS REPORT; CIVIL RIGHTS ACT SECTION 1981 LAWSUIT

Alex you don't get it. Until I get the translations you promised *as far as I'm concerned you are not a man of your word*. *Unlike you I do not work on written agreements. With me everything is based on trust.*

Sent via BlackBerry by AT&T

78. GRIGSBY's *non sequiturs* ignored his written promises to sign a finder's agreement with Plaintiff for having confided the financial structure used to close transactions later described by the multinational law firm Milbank as unprecedented and finding all of the contacts to close the deals.

79. On November 18, 2011, after it became evident that GRIGSBY had deceived Plaintiff (and Plaintiff's counsel) to painstakingly revise the

finder's fee agreement, Plaintiff forewarned that GRIGSBY "would pay for

[his] anti-semitism." Plaintiff also complained of other degrading treatment

that included GRIGSBY sadistically asking Plaintiff to watch GRIGSBY

have sex with a prostitute during his three-day visit to the Plaintiff's home

in Santa Catarina, Brazil, while continuing to request an update about the

$400 Million transaction with CELESC and noting that GRIGSBY's anti-

semitic conduct was actionable under the Civil Rights Act.

**From:** alexander.moskovits@hotmail.com
**Date:** Fri, 18 Nov 2011 04:34:01 -0500
**To:** Calvin Grigsbycgrigsby@grigsbyinc.com
**Cc:** <jorge@gsurfnet.com>
**Subject:** RE: STATUS REPORT; CIVIL RIGHTS ACT SECTION 1981
LAWSUIT

***It is clear to me why Calvin Grigsby Jr. wanted nothing to do with Grigsby
Inc. You were a guest in my home and offended me by asking me to watch
you have sex with a woman, then you showed your bias against Jews in
writing***.  By the end of today, I either get CELESC update from you or you
WILL BE a defendant in a Civil Rights Act, section 1981 lawsuit.  I swear it
on my Jewish father's grave.  ***You will pay for your anti-semitism***, and I will
make sure that everybody in your world gets a copy of the complaint
attaching a copy of the offensive email.  ***Again, as a member of a minority
that has suffered discrimination and persecution, you should have known
better***.  [emphasis added].

80. On January 2, 2012, upon learning that CELESC had closed a

transaction for $400 Million in 2011, albeit reportedly in local currency,

Plaintiff sent a formal letter of resignation to GRIGSBY's attorney and

associate to make a clear record that Plaintiff had withdrawn and ceased

working for GRIGSBY after witnessing him making a corrupt offer to a Brazilian public official on August 3, 2011.

81. On January 1, 2013, only five (5) days after BOA hosted Governor Raimundo Colombo of the State of Santa Catarina for the New York closing of the $726 Million contract, and after Plaintiff led GRIGSBY to believe that he had been made privy to the transaction during a party, GRIGSBY promised, "*I will make sure everyone is compensated fairly*." ***The crucial email was erased from Plaintiff's inbox by "hacking," or other unauthorized access but a third party had fortunately preserved a copy of the email previously sent by Plaintiff***.

From: **Calvin Grigsby** <cgrigsby@grigsbyinc.com>
Date: Tue, Jan 1, 2013 at 8:52 PM
To: Alex Defense Writing <alex@defensewriting.com>

***I [GRIGSBY] will make sure everyone is compensated fairly. How did the new years party go?*** (Emphasis and brackets added).[3]

82. ***On March 17, 2013***, Plaintiff met with SIEGA for lunch in the State of Santa Catarina at which time Plaintiff vigorously complained that his work product and services had been misappropriated to close the deals with BOA, BRAZIL, and the States of Santa Catarina and Mato Grosso. Only five days later, Rafael Souza Pereira, attempted to murder Plaintiff. ***On***

---

[3] This email from GRIGSBY promising fair compensation was erased by "hacking" or other unauthorized access, but it was recovered from a third party who received a copy.

**_March 22, 2013_**, Souza Pereira was fleeing from a murder conviction, but he was readily available to SIEGA and the State of Santa Catarina to attempt to commit another murder.

**_In 2016_**, after a three-year investigation that was obstructed by both the defendants State of Santa Catarina and BRAZIL, Plaintiff established Rafael Souza Pereira's consanguinity with Adriano Souza Pereira, the State of Santa Catarina's Director of Accounting who submitted documents in relation to the $726 Million deal that produced approximately $11 Million in fees, commissions, etc. (1.5%). *See* Exhibit A (attestation executed by Governor COLOMBO, Adriano Souza Pereira, *et al*., and photographs of Rafael Souza Pereira and Adriano Souza Pereira).

### FIRST CAUSE OF ACTION: QUASI-CONTRACT CLAIM
### (UNJUST ENRICHMENT - *QUANTUM MERUIT*)
### (as to all named defendants and DOES 1 through 10)

83. The doctrine of quasi-contract was developed to make sure that those who receive the benefit of services pay the reasonable value of the services to the person who performed them. *See Zolotar v. New York Life Insurance Co*., 172 AD2d 27, 33, 576 NYS2d 850, 854 (1st Dept 1991).

84. All the defendants greatly benefited from the services performed by Plaintiff, and Plaintiff's unprecedented financing structure confidentially imparted to GRIGSBY who shared it with all of the named defendants.

85. Plaintiff provided his confidential work product to GRIGSBY and diligently identified business opportunities, as follows:

(a) Plaintiff, an *alumnus* of the Wharton School of Finance and Commerce, confidentially imparted to GRIGSBY, a forward-thinking[4], unprecedented financing structure to enable *sub-sovereign* states (including state-owned utilities) or municipalities to obtain low-interest loans from U.S. lenders, such as BOA, through a guarantee of repayment provided by the sovereign BRAZIL, facilitated by pledged cash flows allocated by the sovereign to its *sub-sovereign* states, thereby minimizing the risk of default by providing an additional sovereign guarantee (*i.e.*, if the *sub-sovereign* states defaulted on their repayment obligations as borrowers, the sovereign BRAZIL guaranteed repayment through the assignment of cash flows allocated by the sovereign to its *sub-sovereign* states, including but not limited to future oil royalties).

(b) Plaintiff diligently pursued finance business opportunities in the States of Santa Catarina, Mato Grosso, and Maranhão, and elsewhere, meeting with Brazilian public officials with nationwide political party networks, who provided access to those networks of public officials and introduced Plaintiff

---

[4] At the time when Plaintiff confided to GRIGSBY the novel, unprecedented financing structure, which GRIGSBY labeled a "tremendous idea" in his March 12, 2011 email, *see* ¶20, *supra*, the allocation of oil royalties to be distributed by the sovereign BRAZIL to sub-sovereign states and municipalities was still being negotiated, as the producing states, such as Rio de Janeiro, were seeking a lion's share of the oil royalties to be allocated, rather than distribution to all sub-sovereign states and municipalities based strictly on demographic data. The "tremendous idea" was therefore "forward-thinking."

and GRIGSBY to the then Governor Raimundo COLOMBO of the State of Santa Catarina, municipal mayors, seaport administrators, the director of DEINFRA (the department of infrastructure of the State of Santa Catarina), state-appointed decision-makers at CELESC and CASAN, the electric and water/sewage utilities in the State of Santa Catarina, respectively, *et al.*

86. Plaintiff's performed services and the work-product confidentially imparted by Plaintiff to GRIGSBY, who then shared it with all defendants, had received the approval and acceptance by GRIGSBY, who authorized Plaintiff to represent him in South America, while GRIGSBY was an agent/broker for the intended lender BOA, with whom GRIGSBY has had a long-term relationship both before and after the credit transactions related to this lawsuit, and for other sources of financing.

87. Plaintiff had a reasonable expectation of compensation for his services and confidential work product, *see* ¶¶85(a)-(b), *supra*, as expressly promised by GRIGSBY. The value of Plaintiff's work product promised by GRIGSBY was 35 basis points (35% of 1%) of all anticipated transactions exceeding $500 Million dollars or 70 basis points (35% of 2%) of all anticipated transactions under that value. GRIGSBY did not sign a contract with Plaintiff because corrupt demands by all named defendants interfered. GRIGSBY paid defendant SIEGA and COLOMBO Plaintiff's share because SIEGA was willing to participate in paying kickbacks/bribes to COLOMBO.

88. GRIGSBY, then acting as agent/broker for BOA and other sources of financing, and defendants misappropriated Plaintiff's unique work product and services, and unjustly enriched themselves at the expense of the Plaintiff. BRAZIL received payments of approximately $2Billion during 2012-2013 from BOA, and the *sub-sovereign* states which realized hundreds of millions in interest savings on debts refinanced by BOA, also enriched themselves at the expense of Plaintiff. Under New York law, recovery is measured by the amount of benefits derived by Plaintiff's performance. *See Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp*., 418 F.3d 168, 175 (2d Cir.2005) (identifying unjust enrichment as element of quasi-contract and *quantum meruit* as measure of liability for breach of quasi-contract).

89. Defendant SIEGA and defendant State of Santa Catarina actors compounded the damages that Plaintiff suffered from the misappropriation of Plaintiff's work product and services performed by attempting to murder Plaintiff, to interfere with his ability to complain about the misappropriation of the unique merits of the novel financing structure confided by Plaintiff through foreign corrupt practices.

90. Because all named defendants benefited and unjustly enriched themselves at the expense of Plaintiff, equity and good conscience require restitution. This Court may award restitution under a claim of *quasi*-contract for the misappropriation of Plaintiff's "novel idea" (*i.e.*, forward-thinking,

unprecedented financing structure first *confided to* GRIGSBY, then shared by GRIGSBY with SIEGA and all defendants, and later adopted and used to close the known transactions between BOA and the *sub-sovereign* states and CELESC with an approximate value of $2*B*illion);  Exhibit F (7/29/13 report published by Milbank, Tweed, Hadley & McCloy LLP (Milbank), special U.S. counsel to BOA describing BOA's $662 Million loan to the State of Maranhão as "***only the fourth private credit ever entered into by a Brazilian state***, with Milbank having advised on three of them, including a ***$726 million loan to Santa Catarina in December 2012 and a $479 million loan to Mato Grosso in September 2012; the three deals account for nearly $1.9 billion in state credits in Brazil over the past two years***.") (emphasis added); ¶20, *supra* (GRIGSBY: "tremendous idea."). *See Nadel v. Play by Play Toys, Inc*., 34 F.Supp.2d 180, 184 (S.D.N.Y. 1999) (novel idea); *see also AEB & Assocs. Design Group v. Tonka Corp*., 853 F.Supp. 724, 734 (S.D.N.Y.1994).  Plaintiff's unique work product and performed services were misappropriated because ***Plaintiff refused to participate in closing any deals through foreign corrupt practices demanded by all of the defendants***.

91. Plaintiff is entitled to restitution for all closed transactions that adopted and used his "novel idea," including but not limited to the three known deals with the *sub-sovereign* States of Santa Catarina, Mato Grosso, and Maranhão valued at approximately $2*B*illion dollars, the $400 Million

deal with the State of Santa Catarina's state-owned electric utility CELESC, the fourth unprecedented transaction with another Brazilian state referred to in Milbank's July 29, 2013 release, and other deals to be discovered in this litigation. Upon information and belief, the fourth transaction brokered by GRIGSBY using Plaintiff's work product was closed between the oil-rich State of Rio de Janeiro and the International Bank for Reconstruction and Development (IBRD) in the sum of $300 Million, and GRIGSBY has also used Plaintiff's work product and introductions to close transactions with municipalities - Novo Hamburgo, Rio Grande do Sul ($24 Million), Recife, Pernambuco ($130 Million), *etc*.

92. The unprecedented credit transactions with the defendant States of Santa Catarina, Mato Grosso, and Maranhão which adopted and used the forward-thinking sovereign guarantee of the defendant BRAZIL establish that Plaintiff's idea was in fact "novel." *See Nadel*, *supra*, 34 F.Supp.2d at 184; *AEB & Assoc. Design Group*, *supra*, 853 F.Supp. at 734; *see also* Exhibit F (July 29, 2013 report published by Milbank accurately describing that the credit deals with four states of BRAZIL were ***unprecedented***).

## DEMAND FOR JURY TRIAL

93. Plaintiff demands a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

## ON THE FIRST CAUSE OF ACTION

94. For a final judgment against all the defendants, and each of them, awarding Plaintiff compensatory damages of $7 Million dollars plus punitive damages for their interference with and wanton disregard of Plaintiff's rights to contract and to receive payment for his unique work product and services.

95. For costs of suit and any other relief the Court deems proper.

Respectfully submitted,

_____/s/_____
Alexander Moskovits
Caixa Postal 44
Paulo Lopes, Santa Catarina
CEP 88490-970 BRAZIL
alexander.moskovits@hotmail.com
Tel.: (55)(48)98465-9211

## VERIFICATION - JURAT

Per 28 U.S.C. § 1746, I verify under penalty of perjury pursuant to the laws of the United States of America that all of the foregoing facts are  true and correct.

_____/s/_____
Alexander Moskovits